**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

**ORANGEBURG DIVISION**

| | |
|---|---|
| DR. MOREEN B. BISHOP, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 5:04-2319-RBH-BM |
| ) | |
| v. ) | |
| ) | |
| LEE E. MONROE AND, ) | **REPORT AND RECOMMENDATION** |
| VOORHEES COLLEGE, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

This action has been filed by the Plaintiff pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et. seq., as well as for a state law claim for assault and battery. Plaintiff formerly worked at the Defendant Voorhees College. The Defendant Lee Monroe is President of the College.

The Defendants filed a motion for partial summary judgment pursuant to Rule 56, Fed.R.Civ.P., on November 28, 2005.[1] After having received an extension of time to respond, Plaintiff filed a memorandum in opposition to the Defendants' motion on January 17, 2006. Defendants' motion is now before the Court for disposition.[2]

---

[1] Defendants do not seek summary judgment on Plaintiff's state law assault and battery claim.

[2] This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. The Defendants have filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

1



**Background and Evidence**[3]

Plaintiff was employed as Director of Research at the Center of Excellence for Rural and Minority Health from January 2002 through July 2003. The Center for Excellence was funded through a federal grant administered by Voorhees College, and the Center of Excellence was located on the Voorhees College campus. In addition to serving as Director of Research at the Center, Plaintiff also was employed by Voorhees College as an instructor. Plaintiff's salary was initially set at $115,000.00 per year, $45,000.00 of which came from Voorhees College, with the remaining $70,000.00 from the Center of Excellence. See generally, Plaintiff's Deposition, pp. 46-47, 55-58; Exhibits 1 & 2; Singleton Deposition, pp. 27, 29.

Plaintiff testified that from the first time she was introduced to Monroe, when she was considering taking the job at Voorhees, he appeared to be "mesmerized" by her. Plaintiff's Deposition, p. 33. Plaintiff testified that after she started working, Monroe would frequently summon her to his office, where he would make comments about how beautiful she was and how much men liked her. Sometimes Monroe would talk about Dr. Monnie Singleton, Director of the Center (and Plaintiff's direct supervisor), but most of the time it was just about Plaintiff and Monroe. Plaintiff's Deposition, pp. 97-100. Plaintiff testified that on one occasion Monroe told her that if he had met her five years earlier, he would have married her, while on another occasion he asked her whether she knew the affect she had on men and women. Plaintiff's Deposition, pp. 100-101. Plaintiff testified that she told Dr. Singleton about these episodes, and that Singleton told her that Monroe was "hitting on [her]". Plaintiff's Deposition, p. 100. However, Plaintiff testified that she

---

[3]The facts and evidence are considered and discussed in this Report and Recommendation in the light most favorable to the Plaintiff, the party opposing summary judgment. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

2



did not consider Monroe's conduct to be overtly sexual at first.

That all changed in October 2002. Monroe had fired Dr. Singleton as Director of the Center[4], and following the board meeting, Monroe called Plaintiff into his office and started telling her how he was going to take care of her and about how he wanted them to be friends and have a relationship. Plaintiff testified that the implication was that Monroe wanted a sexual relationship. Plaintiff's Deposition, pp. 103-105. Plaintiff testified that she reminded Monroe that he had a wife. Id. Nevertheless, the following week Monroe called Plaintiff offering to be her "godfather", and reiterating that he was going to take care of her and that she "wouldn't have to worry about a job or about anything because he would take care of [her] if [she] would be friends with him." Monroe asked if he could come by her home, but Plaintiff put him off and again reminded him that he was married and that she was too. Plaintiff's Deposition, p. 106.

A few weeks later Plaintiff was in Monroe's office and Monroe stated outright that he wanted to have an intimate, sexual relationship with her. When Plaintiff again pointed out that they were both married, Monroe stated that you didn't have to be married to have that kind of relationship, and that a man and a woman could have an intimate relationship without being married. Plaintiff's Deposition, pp. 107-108. Monroe also began repeatedly calling Plaintiff's house, saying that he wanted to come over and have sex with her, and that she would like it, that she seemed to be the type that would want to be on top, and would want it all the time. Plaintiff's Deposition, p. 118. Monroe continued with this conduct through the fall of 2002 into December 2002, telling Plaintiff that she had "beautiful breasts", that he wanted to "f" the stuffing out of her, and asking her questions such as whether she had been having sex with other men. Plaintiff's Deposition, pp.

---

[4]Singleton was replaced as Director of the Center by Dr. LeRoy Davis.



119-123.

Meanwhile, Plaintiff's original employment contract, which ran from January 1, 2002 through June 30, 2002, had ended, and she had been offered another employment agreement in October covering the time period August 7, 2002 through June 30, 2003. Plaintiff was also seeking reimbursement for relocation expenses she incurred when taking the position at Voorhees. However, her relocation expenses (about $6,000) were not forthcoming, with Plaintiff testifying that Monroe kept "dragging it out". Plaintiff's Deposition, p. 103. Plaintiff testified that Monroe was "hunting [her] down for sex, and I knew it was because of that that he refused to give me back my money because I wasn't giving in to his advances." Plaintiff's Deposition, p. 113.

When Plaintiff received her new contract offer (from August 2002 through June 2003), her salary was cut to $90,000.00. Plaintiff's Deposition, p. 65; Exhibit 3. Plaintiff questioned her salary change, and did not sign this new agreement. Plaintiff's Deposition, pp. 64-65. Plaintiff was then tendered another replacement contract in February 2003 for employment as the Director of Research at the Center effective July 1, 2002, with an offer of her original $115,000.00 annual salary. As with her original contract, $70,000.00 of the salary was to be paid from the federal grant. Plaintiff's Deposition, pp. 50, 71, 73; Exhibit 3; Monroe Deposition, p. 54, Exhibit 3. A letter of agreement was also provided which stated that the portion of her salary being paid from restricted funds ($70,000.00) beyond the contract period was dependent upon additional funds from the grantor. Plaintiff's Deposition, Exhibit 5. Plaintiff refused to sign this letter of agreement because she objected to the language about continued employment being conditioned on continued funding of the grant, and on March 6, 2003 she hired an attorney to handle any further contract negotiations with the College. Plaintiff's Deposition, p. 75, Exhibit 8. Although she had not signed



either of the contracts that had been tendered to her, however, Plaintiff continued to work at both the Center and the College at the rate of $115,000.00 per annum through June 2003. Monroe Deposition, pp. 54-56.

Plaintiff testified that during the time period when she was undergoing the contract dispute with the College, Monroe continued his harassment of her, calling her in January 2003 at home and reminding her that he had the final word on her re-evaluation, and that if she was not going to have a relationship with him, she needed to find another job. Plaintiff's Deposition, pp. 148-149. A few days later Monroe asked her "what is it going to be? You know, what is it going to be? What's your answer?" Plaintiff's Deposition, p. 149. Monroe offered to take her to Jamaica with him, and asked her if she was going to "play cards". Plaintiff's Deposition, pp. 149-150. Plaintiff testified that she again rebuffed Monroe's advances, but that when she left she "realized that he was not going to back down." Plaintiff's Deposition, p. 150.

Plaintiff testified that she then approached Frank Middleton, an employee at the College who was personal friends with Monroe, to get him to intercede with Monroe. Plaintiff testified she believed Middleton would tell Monroe to "back off", even though she never mentioned Monroe's name and didn't say "sexual harassment". Plaintiff's Deposition, pp. 153-154. However, following her conversation with Middleton, she was called to a meeting on February 13, 2003 and was surprised to see Middleton, Monroe, and Sandra Gloster, Voorhees' Director of Human Resources, all sitting there. Plaintiff's Deposition, p. 161. Monroe testified that he called the meeting because Middleton had come to him and told him that Plaintiff had come to him [Middleton] complaining about being sexually harassed, and that he wanted to inquire into this complaint and initiate an investigation. Monroe Deposition, pp. 36-37. However, Plaintiff refused

5



to participate in the meeting or say anything without an attorney being present. Plaintiff's Deposition, p. 170.

After the meeting was concluded, Monroe called Plaintiff back to his office, this time without Middleton and Gloster present. Plaintiff testified that Monroe told her she was "making too much of it" and asked whether he should be concerned, to which Plaintiff replied that she had "nothing to discuss with [him]". Plaintiff's Deposition, p. 171. Plaintiff then wrote Monroe a letter complaining about Monroe's actions and asking to be left alone to do her job. Plaintiff's Deposition, Exhibit 12. Monroe testified that this letter was the first knowledge he had that Plaintiff was accusing him of sexual harassment. Monroe Deposition, p. 37. Monroe responded with a letter dated February 19, 2003, apologizing for anything he had said or done that was inappropriate and telling her that her complaint would be investigated. Plaintiff's Deposition, p. 177, Exhibit 13. Monroe did not, however, acknowledge having done anything wrong. Id. Plaintiff responded in her own letter of February 26, 2003, reiterating that her complaints of sexual harassment were against him alone, and stating that she was initiating formal charges of sexual harassment against him. Plaintiff's Deposition, Exhibit 16. The subsequent investigation of Plaintiff's complaints commenced at the direction of the College's Board of Directors was inconclusive. See Defendant's Exhibit 2.

On April 2, 2003, Plaintiff was notified that the funding for the Center of Excellence was ending and that her salary would be cut, effective June 30, 2003. Plaintiff was offered a new contract for her position with the Center through December 31, 2003 at an annual salary of $45,000.00, as well as a separate contract for a faculty position at Voorhees College for the fiscal year 2003 through 2004 at a salary of $45,000.00. Plaintiff accepted the faculty contract, but did

6



not sign the Center for Excellence grant contract. Plaintiff's Deposition, Exhibit 7. Therefore, as of July 1, 2003, Plaintiff's only income was from the College under the faculty contract. Monroe Deposition, pp. 58-59. At the end of 2003, Plaintiff obtained employment through a research grant at Clemson University, where she is currently employed at a salary of $81,000.00. Plaintiff's Deposition, pp. 95-96.

Plaintiff filed an administrative charge of discrimination with the South Carolina Human Affairs Commission (SCHAC), alleging that she was sexually harassed and constructively discharged. After receipt of a notice of right to sue, Plaintiff filed her Complaint alleging quid pro quo sexual harassment and hostile work environment (first cause of action), assault and battery (second cause of action), and retaliation (third cause of action).

## Discussion

Defendants seek summary judgment on Plaintiff's first and third causes of action. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.

### I.

### (Quid Pro Quo Sexual Harassment/Hostile Work Environment)

In her first cause of action, Plaintiff asserts that she suffered sexual harassment in

7



violation of Title VII which "constituted quid pro quo sexual harassment and created a hostile work environment...." While Plaintiff discusses these two claims together, there are some differences. The principal difference between these two claims is that quid pro quo claims are based on threats which are carried out, while hostile work environment claims involve bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 751 (1998).

1. **Quid pro quo claim**. Plaintiff's quid pro quo claim is based on her allegation that she suffered a salary cut because she rejected Monroe's sexual advances. In order to establish a case of quid pro quo sexual harassment, Plaintiff must show: 1) she belongs to a protected group; 2) she was subjected to unwelcome sexual harassment; 3) the harassment complained of was based on her sex; 4) her reaction to the harassment affected tangible aspects of her compensation, terms, conditions, or privileges of employment; and 5) the Defendants knew or should have known of the harassment and took no effective remedial action. Reinhold v. Commonwealth of Virginia, 135 F.3d 920, 931 (4th Cir. 1998), opinion withdrawn on other grounds and superseded on rehearing by, 151 F.3d 172 (4th Cir. 1998); Johnson v. Runyon, No. 96-1920, 1998 WL 372473, at **4 (4th Cir. June 8, 1998); Smith v. City of North Charleston, 401 F.Supp.2d 530, 536 (D.S.C. 2005).

The evidence shows that when Plaintiff was first employed by the College, she was presented with and signed a staff employment agreement providing for a total annual salary of $115,000.00 (for a period beginning January 1, 2002 through June 30, 2002). This document was dated January 28, 2002 (signed by the Plaintiff on February 4, 2002). Plaintiff's Deposition, Exhibit 2. Plaintiff testified the overt sexual harassment by Dr. Monroe began in October 2002, which she rejected. Plaintiff was then presented with a faculty contract dated October 24, 2002, signed by

8



Monroe and for the period August 2002 through June 2003, for only $90,000.00. Plaintiff never signed this agreement and continued to receive salary payments at a $115,000.00 annual rate through the end of the year, during which time she continued to be harassed by Monroe for sexual favors.

Plaintiff was then presented with a letter of agreement dated February 28, 2003, again signed by Monroe, which set her salary at its original $115,000.00 amount, $70,000.00 of which would come from the Center of Excellence grant and $45,000.00 from the College. This letter of agreement, which was effective retroactive to July 1, 2002, was presented to the Plaintiff shortly after Monroe had called her to his office and asked her if she was "going to play cards". Plaintiff's Deposition, pp. 149-150, Exhibit 5. Plaintiff did not sign this contract either, and instead retained an attorney because of the contingency in the contract that her $70,000.00 salary was dependent on additional grant funds being obtained. Plaintiff thereafter continued to receive pay at her $115,000.00 annual rate through June 2003, even though no contract had been signed.

It is clear from these facts that, although Plaintiff was presented with two contracts/agreements which altered the terms of her original contract after Plaintiff openly resisted Monroe's sexual advances, she continued her employment at the College performing the same duties at the same rate of pay through June 2003, past the date when she reported Monroe's alleged sexual harassment of her in February 2003 and the harassment stopped. Therefore, because Plaintiff's claim involves only unfulfilled threats,[5] it is a hostile work environment claim which requires a showing of severe and pervasive conduct, not a quid pro quo claim. Ellerth, 524 U.S. at 754.

2) **Hostile work environment claim**. To establish a hostile work environment,

---

[5]It is not clear in the record whether Plaintiff was ever reimbursed for her moving expenses; however, neither side has argued that as being a continuing issue or part of Plaintiff's quid pro quo claim.

9



Plaintiff must present evidence to prove the following elements: 1) she was subjected to unwelcome conduct in a work related setting; 2) the conduct complained of was based on her sex; 3) the conduct was sufficiently severe or pervasive to alter her condition of employment and to create an abusive work environment; and  4) the conduct is imputable on some factual basis to her employer. Ocheltree v. Scollon Productions, Inc., 308 F.3d 351, 356 (4th Cir. 2002), rehearing en banc, 335 F.3d 325 (4th Cir. 2003), cert. denied, 124 S.Ct. 1406 (2004); Spicer v. Com.of Va. Dep't of Corrections, 66 F.3d 705, 710 (4th Cir. 1995); Brown v. Perry, 184 F.3d 388, 393 (4th Cir. 1999). For purposes of summary judgment only, the Defendants do not contest that Plaintiff was subjected to unwelcome conduct in work related setting, that the conduct complained of was based on her sex, and that the conduct was sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment.  However, Defendants do contest that the conduct at issue is imputable on some factual basis to the Defendant Voorhees College.  The undersigned does not agree.

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.  When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence....The defense comprises two necessary elements: a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

Ellerth, 524 U.S. at 765.

While Defendants do not contest that Monroe qualifies as a "supervisor" for purposes of Plaintiff's hostile work environment claim, they argue that, since no tangible employment action was taken, they are entitled to assert the Ellerth affirmative defense.  With respect to this affirmative

10



defense, Defendants argue that Plaintiff failed to make a complaint under the College's anti-harassment policy until February 2003, and that once she did make a complaint, her complaint was properly investigated and the offending conduct ceased.

Plaintiff argues that Defendants are not entitled to assert the Ellerth affirmative defense under the facts of this case, and the undersigned agrees. A defendant is not entitled to assert this defense when the harasser "indisputably [falls] within that class of an employer organization's officials who may be treated as the organization's proxy." Faragher v. City of Boca Raton, 524 U.S. 775, 789 (1998). In such a case, vicarious liability automatically applies. Id.; see also Johnson v. West, 218 F.3d 725, 730 (7th Cir. 2000). In this case, there is certainly, at the least, a question of fact as to whether Monroe, as President of Voorhees College, qualifies as the College's "proxy" to survive summary judgment. See Faragher, 524 U.S. at 789-790 [specifically noting that a "president" of an entity can be considered as an official "hold[ing] a sufficiently high position in the management hierarchy...for his actions to be imputed automatically to the employer"]; Johnson v. West, 218 F.3d at 730.

While Defendants may have an argument for why Monroe should not be considered a "proxy" of the College, considered in the light most favorable to the Plaintiff, the undersigned does not find that "[n]o reasonable trier of fact could conclude" that the Defendants are liable to the Plaintiff for having created an actionable hostile work environment under the evidence submitted. Spratley v. Hampton City Fire Dept., 933 F.Supp. 535, 542 (E.D.Va. 1996), aff'd, 125 F.3d 848 (4th Cir. 1997); Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 259 (1986) ["Credibility determinations, the weighing of evidence, and the choosing of inferences from the facts" are functions of the jury]; Muhammad v. Klotz, 36 F.Supp.2d 240, 243

11



(E.D.Pa. 1999) ["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is a need for a trial, that is, 'whether the evidence presents a sufficient disagreement to require submission to [the jury] or whether it is so one-sided that one party must prevail as a matter of law'"], citing Anderson, 477 U.S. at 250-252. Therefore, Defendants' motion for summary judgment on Plaintiff's sexual hostile work environment claim should be denied.

## II.

### (Retaliation Claim)

In her third cause of action, Plaintiff alleges that, after she "reported the sexual harassment conduct of the Defendant Lee E. Monroe to the appropriate officials at Voorhees College including the Human Resource Office and the Board of Trustees....", the Defendants retaliated against her by "reduc[ing] Plaintiff's income by more than $70,000.00 per year...." Complaint, at ¶¶ 23-24. Section 704(a) of Title VII, 42 U.S.C. § 2000(e)-3(a)[setting forth the standard for a retaliation claim], provides as follows:

> It shall be an unlawful practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicants for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Retaliation cases under Title VII are subject to the same requirements of proof as are applicable to disparate treatment claims. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985) overruled on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989);

12



see also Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). "The employee is initially required to establish a prima facie case of retaliation by a preponderance of the evidence. Such a prima facie case consists of three elements: (1) the employee engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action." Id.; Munday v. Waste Management of North America, Inc., 126 F.3d 239, 242 (4th Cir. 1997). Once a prima facie case has been presented, the Defendant employer has the burden of producing a legitimate, non-discriminatory reason for its actions. If the employer can produce a legitimate, non-discriminatory reason for its actions, the employee must then demonstrate that the Defendants' proffered reason is pretextural. Id.

Here, it is uncontested that Plaintiff engaged in protected activity by complaining about Monroe's conduct and initiating an investigation of that conduct under the College's anti-discrimination policy. Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981). Defendants have also not contested for purposes of summary judgment that Plaintiff was subjected to an adverse employment action. The evidence shows that Plaintiff continued in her position at her salary of $115,000.00 per annum through June 2003, the end of the College's fiscal year, but was then offered a new contract for only $90,000.00 per year per annum, consisting of her regular $45,000.00 faculty position salary from the College, but only $45,000.00 for being Research Director for the Center of Excellence, not the $70,000.00 per annum salary she had received previously. Monroe Deposition, pp. 54-60. However, Defendants dispute that there is any causal connection between Plaintiff having engaged in her protected activity on or around February 2003 and this adverse action. After careful consideration of the arguments and evidence presented, the undersigned is constrained to agree.

13



The evidence before the Court clearly establishes that the $70,000.00 per year portion of Plaintiff's annual $115,000.00 salary was paid pursuant to a federal grant which was subject to renewal. Dr. Singleton testified that the funding for the Center of Excellence was a special appropriation by Congress that had to be reapplied for. While he apparently envisioned that the program would continue to be funded for a significant period of time, when asked at his deposition what would have happened if Congress decided to discontinue the grant funding, he replied "I don't know." Singleton Deposition, pp. 28-35. The evidence further reflects that grant funding was only on a fiscal year basis, and that while it was originally extended past its initial funding, the grant funding expired December 31, 2003, and it was not re-funded thereafter. Monroe Deposition, pp. 39-40, 55-56. The evidence further reflects that when the grant was extended the last time, there was only approximately $135,000.00 remaining in the grant fund, which was insufficient to pay the salaries of the Center employees at their original levels. As a result, Dr. Davis, the Director of the Center, incurred a $30,000.00 cut in his salary, while Plaintiff's salary was to be cut (on an annual basis) by $45,000.00. Monroe Deposition, pp. 57-60.

Plaintiff accepted the faculty contract offer of $45,000.00, but did not sign the Center of Excellence contract. Plaintiff's Deposition, Exhibit 7. Therefore, as of July 1, 2003, her only income was from the College under the faculty contract. Monroe Deposition, pp. 58-59. Plaintiff has provided no evidence to dispute any of the Defendants' evidence regarding the demise of this grant program, or to contest the evidence concerning her salary offer in June 2003.[6] Instead,

---

[6]Plaintiff states at the conclusion of her "statement of facts" portion of her opposition memorandum that she was able to secure a "P-20 grant of $5.3 million for four years to continue the program, and took the grant and program to Clemson University, where she is employed as the Director. Plaintiff's Memorandum, p. 9. Plaintiff has, however, pointed to no evidence in the record (continued...)

14



Plaintiff offers only her own surmise and speculation that the reduced salary offer she received in June 2003 was due to retaliation by the Defendants for her having complained about Monroe's conduct. See Contemporary Mission v. United States Postal Serv., 648 F.2d 97, 107, n.14 (2d Cir. 1981) [An "opposing party's facts must be material and of a substantial nature, not fanciful,...conjectural, speculative, nor merely suspicions"] (internal citations and quotation marks omitted); Kulak v. City of New York, 88 F.3d 63, 71 (2nd Cir. 1996) ["conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment"]; Nicolo v. Philip Morris, Inc., 201 F.3d 29, 33 (1st Cir. 2000) [Conjectural allegations and conclusory assertions do not suffice to establish a genuine issue of fact]; Cecilino v. Allstate Ins. Co., 908 F.Supp. 519, 532 (N.D. Ill. 1995) [a simple showing that an adverse action occurred after a complaint of discrimination "is not enough to make out a prima facie case of retaliation, let alone survive a motion for summary judgment"].

In any event, the evidence before the Court establishes legitimate, non-discriminatory reasons on the part of the Defendant for the employment decision at issue, and Plaintiff has failed to set forth evidence of pretext sufficient to survive summary judgment on her retaliation claim. In order to show pretext, Plaintiff must show that "but for" her employer's intent to retaliate against her for having engaged in protected conduct, she would not have suffered the alleged adverse

---

⁶(...continued) which supports this statement. See Estrella v. Bryant, 682 F.2d 814, 819 (9th Cir. 1982) [legal memoranda are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment]; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) [there must be evidence on which a jury could reasonably find for the Plaintiff]; Gans v. Gray, 612 F.Supp. 608, 619 (E.D.Pa. 1985) [mere statements made in counsel's briefs are not evidence for the purpose of supporting or opposing a motion for summary judgment]; cf Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1358 (4th Cir. 1995) [counsel's statements are not evidence].



employment action. EEOC v. Clay Printing Co., 955 F.2d 936, 941 (4th Cir. 1992); Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 234 (4th Cir. 1991).  "Direct or indirect evidence of [retaliatory] motive may do, but 'the evidence as a whole . . . must be sufficient for a reasonable fact-finder to infer that the employer's decision was motivated by [retaliatory animus].'" LeBlanc v. Great American Insurance Co., 6 F.3d 836, 843 (1st Cir. 1993)(citing Goldman v. First Nat'l Bank, 985 F.2d 1113, 1117 (1st Cir. 1993)(quoting Connell v. Bank of Boston, 924 F.2d 1169, 1172, n. 3 (1st Cir. 1991), cert. denied, 111 S.Ct. 2828 (1991)); Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 140-149 (2000).   As previously noted, the evidence presented to the Court reflects that the reason Plaintiff's June 2003 Center of Excellence contract was for less than her previous contract was because the grant funding was about to run out.  Plaintiff has offered no evidence to dispute this fact or to show that the reason her contract was not renewed at a rate of $70,000.00 per annum was because of a retaliatory animus by the Defendants.

Plaintiff has an obligation to present evidence to save her allegations from the status of speculation, and must respond to the Defendants' evidence with specific facts showing a genuine issue for trial to survive summary judgment.  Rule 56, Fed.R.Civ.P.; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gairola v. Virginia Dep't of General Services, 753 F.2d 1281, 1288, n. 4 (4th Cir. 1985). She has failed to do so. Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) [A party opposing summary judgment "cannot create a general issue of fact through mere speculation or by the building of one inference upon another."].  Therefore, Plaintiff's retaliation claim should be dismissed.

## Conclusion

Based on the foregoing, it is recommended that the Defendants' motion for summary



judgment be **granted** with respect to Plaintiff's retaliation claim, and that this claim be **dismissed**. Defendants' motion for summary judgment with respect to Plaintiff's sexual harassment hostile work environment claim should be **denied**.

_____
Bristow Marchant
United States Magistrate Judge

Columbia, South Carolina

June 27, 2006



17